David McCandless

---

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION

CASE NUMBER 2:06-CV-1754

FIREMAN'S FUND INSRUANCE COMPANY, as
SUBROGEE for LIMEHOUSE & SONS, INC.,
        Plaintiffs,
    v.
AMERICAN EQUIPMENT CORPORATION, INC., ET AL.,
        Defendants.

DEPOSITION OF
DAVID McCANDLESS

At Raleigh, North Carolina
Tuesday, April 14, 2009
10:02 a.m.
Reported by: Lindsey D. Cline, CVR

---

Page 2

APPEARANCES

For the Plaintiff:      Christopher M. Caputo, Esq.
                        LESS, GETZ & LIPMAN
                        100 Peabody Place
                        Suite 1000
                        Memphis, Tennessee 38103

For the Defendant,      Brandt R. Horton, Esq.
Grove, et al:           YOUNG CLEMENT RIVERS, LLP
                        28 Broad Street
                        Charleston, South Carolina 29401

For the Defendant,      Patrick Smith, Esq.
American Equipment      HARPER, LAMBERT & BROWN, P.A.
Company, Inc.:          Suite 220, 420 E. Park Avenue
                        Greenville, South Carolina 29602

---

Page 3

TABLE OF CONTENTS
EXAMINATIONS

| EXAMINATION | PAGE |
|---|---|
| Direct Examination by Mr. Caputo | 6 |
| Cross Examination by Mr. Horton | 121 |
| Redirect Examination by Mr. Caputo | 132 |

TABLE OF CONTENTS
EXHIBITS

| EXHIBITS | DESCRIPTION | MARKED/REFERENCED |
|---|---|---|
| Plaintiff's | | |
| Number 1 | Document Subpoena | 10/ |
| Number 2 | David McCandless's Report | 36/ |
| Number 3 | Paul Eason's Report | 103/ |


EXHIBIT D

---

Page 4

STIPULATIONS

It is hereby stipulated and agreed between the parties to this action, through their respective counsel of record:

1. The deposition of David McCandless may be taken on April 14, 2009, beginning at 10:02 a.m., at the offices of YOUNG, MOORE & HENDERSON, located in Raleigh, North Carolina, before Lindsey D'Anne Cline, Notary Public and Certified Court Reporter.

2. Said deposition shall be taken for the purpose of discovery or for use as evidence in this above entitled action or for both purposes.

3. Any objections of any party hereto as to notice of the taking of said deposition, or as to the time or place thereof or as to the competency of the person before whom the same shall be taken are deemed to have been met.

4. Objections to questions and motions to strike answers need not be made during the taking of this deposition but may be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any

David McCandless

Page 89

1  Q.  Okay. Could you tell from a failure? Could you
2      tell whether a hose that had already failed
3      satisfied the SAE standards?
4  A.  I don't know the answer to that.
5  Q.  Okay. Is it because you've never thought of it or
6      because it's unknowable for some reason?
7  A.  Well, it's -- I haven't really considered that,
8      but when you're looking at one particular failure,
9      you have to assess the information related just to
10     that failure. You're not necessarily looking
11     at -- the performance standard may not be the
12     exact conditions that the hose is in and used, so
13     I don't -- I don't know that you can definitely
14     establish that connection.
15 Q.  Okay. Would every crimp specification have to
16     meet the SAE standards?
17 A.  It wouldn't have to, no.
18 Q.  So what is the purpose of the SAE standards?
19 A.  So that if -- Using Grove, if Grove wanted to buy
20     hoses from company A or from company B, they could
21     tell either manufacturer, "We need a hose that
22     meets SAE standard X," and the two manufacturers
23     may use completely different methods to achieve
24     that, but they could each supply Grove with a hose

Page 90

1      that would meet that performance. It provides a
2      uniform goal for all the different hose
3      manufacturers to use.
4  Q.  So that would be a document that would be issued
5      by Grove that set forth to its manufacturers, "You
6      need to meet these performance standards"?
7  A.  Well, no, SAE would create the document. And I
8      don't know in this -- on this particular crane if
9      SAE is the governing body.
10 Q.  I understand.
11 A.  But they have standards for hoses.
12 Q.  Right.
13 A.  But Grove doesn't author those. Grove may look at
14     it and say, "Oh, that particular SAE standard is
15     the one we want to specify for a particular hose."
16 Q.  Do you know whether Grove requested that any
17     standards be met with respect to this hose and
18     this fitting?
19 A.  I have no idea.
20 Q.  Now, why would the crimp specification be
21     significant to the determination of why the hose
22     fitting assembly failed?
23 A.  Well, it's significant in that if you're trying to
24     say that the crimp was substandard or defective or

Page 91

1      inadequate, you would need to know -- you would
2      need to have a standard to compare it to to say
3      what made it inadequate.
4          You can't say just because it failed
5      that it was inadequate because this is a part
6      that, if left in service, is going to fail. It
7      will fail eventually if you leave it in service.
8      So just because it fails, that doesn't mean that
9      there was a problem with it. It doesn't mean that
10     it was defective.
11         In order to make that connection, you
12     need to know what defines "defective" and what
13     would define "defective" in a crimp is the
14     dimensions of the crimp. Either it was too big,
15     either it was too small, either it didn't have
16     enough compression on it. That's what would
17     define "defective," not, "It came apart."
18 Q.  Well, wouldn't the crimp specification that is set
19     take into account the expected useful life of the
20     product?
21 A.  It would take into account the environment or,
22     again, whatever standard they were designing the
23     hose to, but that standard doesn't define what use
24     environment the hose necessarily sees, so there's

Page 92

1      kind of a disconnect there that you can't
2      automatically assume.
3  Q.  Well, wouldn't the standard that the hose was
4      manufactured to have to at least meet the
5      published useful life of the hose?
6          MR. HORTON: Object to the form.
7          THE WITNESS: No, because there's not -- this
8      hose may have a different life, depending on what
9      component you put it on or what machine you put it
10     on or what environment it's in. It may have a
11     life of X number of years when you put it on a
12     bulldozer, but it may have a life half that if you
13     put it on an airplane.
14 Q.  (Mr. Caputo) Right.
15 A.  There's -- The expected life is not the hose
16     manufacturer's bailiwick.
17 Q.  Okay. So let me ask you a different way. If
18     there is no evidence of abnormal wear and tear to
19     the hose and there's no evidence that some trauma,
20     external trauma, pulled the hose out, okay,
21     assuming those facts --
22 A.  Okay.
23 Q.  -- if a hose fails by coming loose from its
24     fitting prior to the expected end of its useful

David McCandless

Page 129

1  experience with failure analysis?
2      MR. CAPUTO: Objection.
3      THE WITNESS: Yes.
4  Q. (Mr. Horton) Is this similar to the failure
5     analysis that Mr. Eason based his opinion on?
6      MR. CAPUTO: Objection.
7      THE WITNESS: I don't know that ours are the
8     same because I have different conclusions and
9     things based on reviewing the same information.
10    But I don't believe he, as we've said before, has
11    a technical basis to arrive at some of the
12    opinions that he did.
13 Q. (Mr. Horton) Okay. Well, not the actual
14    conclusions, but just based upon the scientific
15    principles underlying his conclusion and your
16    conclusion, just taking aside for a moment the
17    fact that they're different.
18         Is your experience with failures
19    analysis similar to his experience with failures
20    analysis? Is it the same body of science or
21    technical underlying?
22     MR. CAPUTO: Objection.
23     THE WITNESS: Similar, yes.
24 Q. (Mr. Horton) Okay. In your opinion, is there any

Page 130

1  way to -- using failures analysis -- to conclude
2  that a crimp is -- or a fitting is too loosely
3  crimped without knowing the specifications?
4  A. **No, I don't believe so.**
5  Q. Yet that's what Dr. Eason concluded, isn't it?
6  A. **If we're talking about an FMEA, which is a Failure**
7     **Mode and Effects Analysis, that type of analysis**
8     **presumes a failure and you examine the results of**
9     **it to try to determine what failures you don't**
10    **want or how to address those modes of failure.**
11         **I don't know that that particular**
12    **analysis in any way can tell you whether a crimp**
13    **was too loose or too tight, given the information**
14    **we have here. It's not -- it's not the process**
15    **you would use.**
16 Q. Can Dr. Eason's conclusion be based upon technical
17    expertise?
18    MR. CAPUTO: Objection.
19    THE WITNESS: No.
20 Q. (Mr. Horton) In your opinion, as someone who
21    does, as you call it, FMEA --
22 A. **Yes.**
23 Q. In your opinion, is someone who performs or is
24    familiar with FMEA, is Dr. Eason's conclusion

Page 131

1  based upon scientific methods?
2     MR. CAPUTO: Objection.
3     THE WITNESS: No, I don't believe so, because
4  there's not a known standard to base it on.
5  Q. (Mr. Horton) Okay. In your review of Dr. Eason's
6     report, his deposition testimony, and his -- and
7     the general background of FMEA, is Dr. Eason's
8     conclusion based upon scientific knowledge?
9     MR. CAPUTO: Objection.
10    THE WITNESS: No, I don't believe that it is.
11 Q. (Mr. Horton) Is Dr. Eason's conclusion based on
12    reasonable technical knowledge?
13    MR. CAPUTO: Objection.
14    THE WITNESS: No, I don't believe that it is.
15 Q. (Mr. Horton) All right. In your opinion, after
16    having viewed Dr. Eason's deposition testimony and
17    expert report and your familiarity with FMEA, can
18    Dr. Eason's conclusions be the product of reliable
19    principles and methods?
20    MR. CAPUTO: Objection.
21    THE WITNESS: No, I don't believe so because
22    there's not any -- there's not a known standard
23    that is the basis of the opinion.
24 Q. (Mr. Horton) Okay. All right. I think that may

Page 132

1  be all the questions I have. I appreciate -- I
2  appreciate your time.
3  REDIRECT EXAMINATION BY MR. CAPUTO:
4  Q. Just a follow up. Exactly what's the known
5     standard that is lacking in Dr. Eason's opinion?
6  A. **The crimp specifications.**
7  Q. Okay. So -- But for the crimp specification,
8     there weren't any other standards that he would
9     need to base his analysis on? Just -- It should
10    be attested whether the spec was met or not?
11 A. **I think that's absolutely required to reach the**
12    **opinions that he has. I mean, his basic opinion**
13    **is that this crimp was too loosely crimped.**
14 Q. Uh-huh.
15 A. **He can't define what loose is. And the only way**
16    **you're going to define that is with the**
17    **specifications of the crimp.**
18 Q. And that's something the hose manufacturer would
19    have?
20 A. **Typically, yes.**
21 Q. And that's something that Grove has not shared
22    with you?
23 A. **I do not have those specifications.**
24 Q. Okay. Do you know whether Grove has ever

Pages 129 to 132

Court Reporting Services
919-832-4114